[Cite as *State ex rel. Levitin v. Indus. Comm.*, 2022-Ohio-2750.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Rimma Levitin, | : | |
| Relator, | : | |
| v. | : | No. 20AP-495 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

D E C I S I O N

Rendered on August 9, 2022

**On brief:** *Bentoff & Duber Co., L.P.A., Glen S. Richardson,* and *Brandon Duber*; *Paul W. Flowers Co., L.P.A., Paul W. Flowers*, and *Louis E. Grube,* for relator.

**On brief:** *Dave Yost,* Attorney General, and *Cynthia Albrecht*, for respondent Industrial Commission of Ohio.

**On brief:** *Thomas & Company, L.P.A., Michael A. Moskowitz,* and *Scott W. McKinley,* for respondent Menasha Corporation.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

KLATT, J.

{¶ 1} Relator, Rimma Levitin, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate its order that found her employer, respondent Menasha Corporation ("employer"), did not commit a violation of a specific safety requirement ("VSSR").

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who issued a decision, including findings of fact and

conclusions of law, which is appended hereto.  The magistrate found that there was some evidence to support the commission's decision that the employer did not commit a VSSR. The magistrate also found there was some evidence to support the commission's conclusion that the employer had not been forewarned by a prior accident or incident and that it had no reason to believe the modified guard posed an increased risk of injury.  Therefore, the magistrate has recommended that we deny relator's request for a writ of mandamus.

{¶ 3}  Relator has filed objections to the magistrate's decision.  Although relator's objections are not clearly and separately delineated, we interpret relator's arguments as essentially presenting two objections:  (1) the magistrate erred by finding there was some evidence to support the commission's conclusion that the modified guard provided reasonable protection as required by Ohio Adm.Code 4123-1-5-11(D)(10)(a); and (2) there was some evidence to support the commission's conclusion that the employer had not been forewarned that the modified guard might increase the risk of injury or malfunction.  We find both objections unpersuasive.

{¶ 4}  With respect to relator's first objection, the magistrate's decision cites extensively to the testimony of multiple lay witnesses as well as expert testimony supporting the commission's decision that the modified guard provided reasonable safety, and therefore, the employer did not commit a VSSR.  The magistrate's decision specifically identifies the evidence supporting the commission's conclusion that the modified guard worked as expected after being regularly tested and did not make the machine less safe. Although relator points to other testimony and evidence that might support a different conclusion, relator is essentially asking this court to reweigh the evidence and to substitute its judgment for that of the commission.  It is not proper for this court to reweigh the evidence. *State ex rel. Bob Marshall Ents. v. Indus. Comm.*, 10th Dist. No. 11AP-816, 2013-Ohio-943, ¶ 10 (courts may not reweigh the evidence considered by the commission but must uphold the commission's decision so long as it is supported by some evidence). Because we agree with the magistrate that there is some evidence supporting the commission's determination that the modified guard provided reasonable protection as required by Ohio Adm.Code 4123-1-5-11(D)(10)(a), we overrule relator's first objection.

{¶ 5}  In her second objection, relator argues that the magistrate erred by concluding there was some evidence supporting the commission's determination that the

employer had not been forewarned of an increased risk of injury or malfunction due to the modified guard. Again, we disagree. As noted by the magistrate, there was evidence that the modified guard had not previously failed to protect an employee from the exposed nip point as required by Ohio Adm.Code 4123-1-5-11(D)(10)(a). In addition, the magistrate identified substantial testimony from multiple witnesses and other evidence indicating that the employer had no reason to believe there was an increased risk of injury or malfunction due to the modified guard. There was evidence that the employer tested the modified guard regularly and that it worked as expected. There was also testimony that the employer was unaware of any complaints or concerns about the modified guard. We recognize there was some conflicting evidence on this issue. Nevertheless, it is not for this court to reweigh the evidence. Weighing the evidence is the commission's responsibility. Because there is some evidence to support the commission's determination that the employer had no reason to believe that the modified guard increased the risk of injury or malfunction, we overrule relator's second objection.

**{¶ 6}** Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.

*Objections overruled; writ of mandamus denied.*

DORRIAN and McGRATH, JJ., concur.

———————

## APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Rimma Levitin, | : | |
| Relator, | : | |
| v. | : | No. 20AP-495 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

### M A G I S T R A T E ' S   D E C I S I O N

Rendered on February 7, 2022

*Bentoff & Duber Co., L.P.A., Glen S. Richardson*, and *Brandon Duber*; *Paul W. Flowers Co., L.P.A., Paul W. Flowers*, and *Louis E. Grube,* for relator.

*Dave Yost,* Attorney General, and *Cynthia Albrecht*, for respondent Industrial Commission of Ohio.

*Thomas & Company, L.P.A., Michael A. Moskowitz,* and *Scott W. McKinley,* for respondent Menasha Corporation.

IN MANDAMUS

{¶ 7} Relator, Rimma Levitin ("claimant"), has filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order that found her employer, respondent Menasha Corporation ("employer"), did not commit a violation of a specific safety requirement ("VSSR").

Findings of Fact:

{¶ 8}    1. Claimant sustained a work-related injury on June 2, 2017, when her right hand was caught in the rollers of a Pioneer flatbed diecutter machine ("machine"). Her workers' compensation claim was allowed for the following conditions: displaced fracture of proximal phalanx of right middle finger; displaced fracture of proximal phalanx of right ring finger for open fracture; displaced fracture of middle phalanx of right index finger; displaced fracture of middle phalanx of right middle finger; crushing injury of right thumb; index finger metacarpophalangeal joint contracture, right; ulnar digital neuroma right index finger; right index finger ulnar-sided scar band at the digital palmar crease; posttraumatic stress disorder; and right shoulder tendonitis.

{¶ 9}    2. On the date of injury, claimant was working as an operator of the machine for the employer. The manufacturer of the machine is no longer in business. Claimant had worked for the employer for 24 years, 10 of those years on the employer's three Pioneer flatbed diecutter machines ("machines"). To use the machine, the first of two operators place a die on conveyor belts ("conveyors" or "belts"). The ends of each belt are attached to each other by "lacing," also referred to as "staples," through which a pin is inserted, to form a continuous loop of material. The first operator then places a piece of corrugated plastic on the die. The conveyors pull the die between two horizontal rollers housed in a central "tower." The rollers press the corrugated plastic into the metal die rule and cut the plastic. The die and cut plastic sheet are then expelled from the other side of the machine and taken by the conveyors to a second operator, who removes the cut material and repeats the process in the opposite direction back toward the first operator. The machine can be operated automatically, so that the die is fed in both directions at a set pace, or manually, so that the operator controls when the die is fed each cycle. The machine can complete hundreds of cycles per hour, depending on the settings and job specifications. The place where the two rollers meet creates a "nip point," as defined in Ohio Adm.Code 4123:1-5-01(B)(94). The rollers are enclosed, and the only access to the rollers is through a 9.791-foot-long opening where the die enters and exits the machine. A "flip-guard" is attached to the top of the opening along the entire length. The flip-guard is attached to the machine by a hinge that rests on an interlock switch. When the flip-guard is raised as little as one fourth

through three eighths of one inch, the interlock switch is activated and power to the machine is cut off.

{¶ 10} 3. Approximately ten months before the incident in question, the employer renovated the machines via a Total Production Maintenance ("TPM") project, which determined that the flip-guard should be replaced due to bowing. The employer had a replacement flip-guard ("modified guard") fabricated to the same specifications of the original flip-guard ("original guard") by Sheet Metal Fabricators Corporation, but the employer modified the design of the original equipment manufacturer ("OEM") by attaching a one-inch-square steel tube to the entire length of its front, which prevented bowing but also increased the weight of the modified guard.

{¶ 11} 4. A few months after the machine operators started using new gloves, and approximately ten months after the modified guard was installed on the machine, claimant's gloved hand was caught in the nip point of the rollers. Her hand and fingers were crushed. Claimant claimed her glove had become snagged on a conveyor staple or the pin used to connect the lacing.

{¶ 12} 5. The maintenance logs for the machines do not indicate any prior instances in which the modified guard failed.

{¶ 13} 6. The investigation by the Federal Occupational Safety and Health Administration ("OSHA") indicated that the modified guard was ineffective in that the one-inch bar made it too heavy to lift in the event an employee hit it, thereby preventing the modified guard from functioning as designed. OSHA issued a citation on August 8, 2017.

{¶ 14} 7. On August 30, 2017, OSHA prepared an informal settlement agreement, and indicated in a revised citation that the machine guarding was insufficient to prevent employees from reaching the point of operation hazard, in that the modified guard did not operate efficiently and effectively for that piece of equipment.

{¶ 15} 8. The record contains numerous depositions from claimant, the employer's management, the employer's employees, and the employer's former employees.

{¶ 16} 9. In her deposition, claimant testified: (1) there were complaints that materials were hitting the original guard and stopping the machine; (2) the materials would hit the bar on the original guard and bend it; (3) she was not aware of any operator's hand getting caught in the machine prior to the installation of the modified guard; (4) the

modified guard was heavier and allowed a wider opening to the machine; (5) when the employer modified the guard, it also added another stop button close to the guard; (6) the machine operators had been mentioning the need for a light curtain (a safety guard that stops a machine if an operator's hand passes through a beam of light), but she never specifically mentioned it to any supervisors; (7) on the day of her injury, her glove was caught on a belt staple, and the belt pulled her hand into the rollers; (8) she was hitting the modified guard, but it would not flip up and stop the machine; (9) she tried to use her free hand to pull out her caught hand from the rollers; (10) she did not tell anybody about any safety concerns on the day of the accident or in the prior month; (11) she did not know if anybody had ever had a conversation with Matt Burger, a manager, about the safety of the machine; (12) she did not have any conversations with Matt Philpott, a manager, or John Goff, her supervisor, about the safety of the machine, and she did not know of any others who had; (13) she had discussed a light curtain for the machine with managers, maintenance, and mechanics, but she never discussed it with Burger, Philpott, or Goff; and (14) she told Burger that the modified guard was too heavy, and he said the company would look into it.

{¶ 17} 10. In his deposition, Christopher Pickett, the vice president and an engineer at Sheet Metal Fabricators Corporation, testified: (1) the employer contacted his company to fabricate the modified guards; (2) the employer asked the company to make a guard identical to the original guard but add a steel tube to make it stiffer; (3) he was not involved in the installation or testing of the modified guard, and he did not know how the modified guard was going to operate; and (4) the employer never complained about the modified guards after they were delivered.

{¶ 18} 11. In his deposition, Robert Soucy, who was the facilities manager and technical manager at the employer, testified: (1) on a weekly basis, the employer performs a visual inspection of all wear components of the machine, and on a monthly basis, the employer performs an internal inspection of the machine; (2) the safety guards and the emergency stop buttons on the machine are visually tested every week; (3) materials that hit the original guard would shut off the machine, but it was not a common occurrence, maybe occurring once per quarter while cutting thicker materials; (4) during the time of the TPM, no machine operators raised the issue of the machine shutting off frequently

because materials or dies were hitting the guard; (5) he did not know why the one-inch bar was added to the length of the modified guard; (6) the modified guard was heavier than the original guard; (7) the employer did not contact the manufacturer of the machine or a guarding expert prior to fabricating the modified guard; (8) material hitting the guard both before and after the guard was modified shut off the machine, and the rate that it occurred remained the same with the original and modified guards; (9) the modified guard was not tested in actual production to see if it performed the same as the original guard; (10) after the modified guard was installed, he knew of no complaints regarding it; (11) if he would have had knowledge of any problems with the modified guard, the employer would have shut down the machine; (12) he did not know of any guarding experts who tested the modified guard; (13) there were no serious injuries on the machine prior to the TPM; (14) after the accident, the employer added a new guard and then added a light curtain; (15) he disagreed with the OSHA finding that the guard was ineffective and the metal bar that was added to the length of the guard made it too heavy to be lifted in case an employee hit it; (16) the modified guard was not less safe than the original guard; (17) the modified guard was safe and effective; and (18) the light curtain was added after claimant's injury so that employees would not work as closely to the machine as claimant was working when she was injured.

{¶ 19} 12. In his deposition, James M. Tatulinski testified: (1) he is a maintenance technician at the employer; (2) he inspects the belts, guards, and stops of the machine weekly; (3) the monthly inspection does not include the guards; (4) if employees were claiming that materials or dies were striking the original guard commonly, he would have probably heard about it; (5) he heard of materials striking the original guard about once per year; (6) the modified guard would take more force to lift than the original guard; (7) he was never told that the modified guard was too heavy or the operators were having difficulty lifting it; (8) the employer did not test the modified guard after it was installed to see if it worked when something struck it; (9) the employer did not contact the manufacturer or any guarding experts to test the machine after the modified guard was installed; (10) nobody had suggested light curtains on the machine prior to the accident; (11) the guard was ineffective because the metal bar was added to the length, making it too heavy to be lifted if an operator hit the guard; (12) the modification of the guard during the TPM made

the machine less safe; (13) he would routinely lift the guard during inspections to test whether the machine stopped; and (14) he had before the accident lifted the guard on one of the machines, and the machine did not turn off, necessitating the replacement of a switch under the guard or adjustment of the switch arm.

{¶ 20} 13. In his deposition, Stephen Fielder testified: (1) he was claimant's production supervisor at the employer; (2) no operators ever told him the machine guards were too heavy; (3) he never heard complaints about dies or material striking the guards; (4) the modified guard should have prevented the injury; (5) based on what other employees told him, he wrote in the incident report that claimant had tried to catch up with the die and place material on it as it entered the rollers; (6) he was not aware of any other accidents on any of the Pioneer machines before or after the incident in question; and (7) prior to the incident, nobody had asked that a light curtain be put on the machine.

{¶ 21} 14. In his deposition, Mladen Sestan testified: (1) he is a maintenance technician at the employer; (2) he inspects the guard on the machine weekly by lifting it to make sure the machine stops; (3) he does not test the guard by hitting the guard with his hand; (4) he also tests the guard in his monthly maintenance routine; (5) nobody ever told him the modified guard was too heavy; (6) he believed the modified guard was operating as intended the day of the injury; and (7) he knew of no other injuries on the machines before or after claimant's injury.

{¶ 22} 15. In his deposition, Mathew Philpott testified: (1) he was a continuous improvement manager at the employer; (2) he was not concerned that the design of the modified guard was unsafe; (3) the team designing the modified guard knew it was heavier than the original guard, but the team tested it, and it still worked as expected; (4) no operator, including Jennifer Betts, ever told him that the modified guard was too heavy; (5) Betts was lying about telling him that the modified guard was too heavy; (6) he did not test the modified guard simulating an employee's hand striking the guard; (7) he believed claimant's injury would have occurred with the original guard too; (8) he did not believe that the addition of the one-inch bar to the modified guard caused or contributed to the injury; and (9) nobody ever discussed light curtains prior to claimant's accident.

{¶ 23} 16. In her deposition, Laura Bonner testified: (1) she was the human resources manager at the employer; (2) she never received any complaints about the

modified guard; and (3) at the hospital, Betts said something to her about the metal bar on the modified guard possibly impacting the operation of the guard.

{¶ 24} 17. In her deposition, Nayana Shah testified: (1) she is a machine operator at the employer; (2) she never considered claimant a danger to herself or others, and she was competent; (3) the modified guard still flipped up once in a while when thicker material hit it, but much less frequently than with the original guard; (4) she had to use two hands to lift the modified guard, but she could lift the original guard with one hand; (5) she did not think claimant would have been injured if the original guard was still on the machine; (6) she thought the modified guard did not function appropriately when claimant was injured; (7) she never told anybody that the modified guard was too heavy; and (8) she believed the original guard was safer than the modified guard.

{¶ 25} 18. In his deposition, Brian Trunkely testified: (1) he is a maintenance apprentice at the employer; (2) maintenance inspects the flip guards weekly; and (3) nobody ever told him that the modified flip guard was too heavy.

{¶ 26} 19. In his deposition, David Boron testified: (1) he was a maintenance mechanic at employer; (2) maintenance performed weekly inspections on the flip-guards to see if they stopped the machine; (3) although the modified guards were heavier than the original guards, he did not think the modified guards were more difficult to lift; (4) the original and modified guards were designed to stop the machine when the operator lifted the guard but not merely touched the guard; (5) the modified guard did not make the machine less safe; (6) to shut off the machine, the modified guard had to be lifted less than one-half inch; and (7) he was able to lift the modified guard with one hand.

{¶ 27} 20. In his deposition, Kiran Patel testified: (1) he was a machine operator at the employer; (2) he never saw claimant do anything dangerous on the machine; (3) the modified guard was heavier than the original guard; (4) the modified guard did not make the machine less safe; (5) after the TPM, if an operator were to accidentally hit the modified guard, it was the same amount of force to activate it as the original guard; (6) he was working with claimant on the opposite side of the machine at the time of her injury, and the machine was on automatic; (7) the guards were working the same on the date of the accident and did not fail; and (8) material would hit both the original and modified guards and stop the machine.

{¶ 28} 21. In her deposition, Betts testified: (1) she believed the original guard was operating safely before the modification; (2) the modified guard was much more difficult to trigger the machine shutoff; (3) the modified guard was very heavy, whereas the original guard was very light; (4) the modified guard was not triggered by material hitting the guard; (5) the modified guard was not triggered by hands hitting the guard; (6) she told Philpott that the modified guard was too heavy, and she could not lift it with two hands; (7) Philpott told her to deal with it; (8) she did not believe the modified guard was as safe as the original guard; (9) she did not tell anybody else besides Philpott that the modified guard did not flip up when it was hit; (10) she believed the modification of the guard was tantamount to the removal of the guard; (11) if the original guard had been in place still, the accident in question would not have happened; (12) she never saw the modified guard move; and (13) she never told her supervisor, Goff, about her concern regarding the weight of the modified guard.

{¶ 29} 22. Nicole Boughton, a former employee of the employer, testified in her deposition: (1) she thought the modified guard was unsafe; (2) she never told the employer it was unsafe; (3) when the original guard was on the machine, it would stop a lot when the die jumped or she used a thicker material; (4) the modified guard was much heavier than the original guard; (5) with the modified guard installed, the machine did not stop as often because the bar was much heavier; (6) if the modified guard was hit by a die, it would stop because the dies are heavy, but just bumping the modified guard with a hand or even with material would not stop the machine; (7) the machine with the original guard was safer for the operator; (8) if an employee's hand hit the modified guard, it would not trigger a shutoff; and (9) she only saw the machine stop once after the modified guard was installed, when running with a thick material.

{¶ 30} 23. Eyvonne Thurman, a current employee of the employer working as a press operator, testified in her deposition: (1) the modified guard was heavier than the original guard; (2) she never saw the modified guard flip up and turn the machine off, whereas the original guard often shut off the machine; (3) the original guard was more safe than the modified guard; (4) she did not know of any prior accidents or injuries on any of the machines; (5) prior to the incident, neither she nor anybody else mentioned to the employer that the guarding was unsafe or needed improvement; (6) she never told the

employer that the modified guard was not triggered by material or a hand; (7) she tried to lift the modified guard after it was first installed, and she could not lift it; and (8) the modified guard was tantamount to having no guard at all.

{¶ 31} 24. Gerald Rennell, a machine-guarding expert who authored an affidavit submitted by claimant, stated in the affidavit that, after reviewing the affidavits and evidence regarding the incident, the employer failed to consult with the manufacturer of the machine or any guarding expert regarding the substantial modification it made on the replacement flip-guard and failed to thoroughly and appropriately test the modified guard in a way that simulated an operator's hand striking the guard. He also opined that the modified guard increased the weight of the guard such that it failed to raise and stop the movement of the rollers. He further stated that the employer knew of the risk of injury based upon prior employee complaints, and showed a total disregard for safety that was equivalent to an intent to injure the employees.

{¶ 32} 25. Darrell R. Wallace, a professor of mechanical, industrial, and manufacturing engineering, completed a report at the request of the employer. In the report, Wallace indicated that the flip-guard configuration and operation are an OEM design and operated as expected. Wallace further stated that the reinforcing bar in no way altered the function of the modified guard, and it functioned as designed by the OEM.

{¶ 33} 26. On August 28, 2017, claimant filed an IC-8 application for additional award for VSSR. Eventually, claimant narrowed her VSSR claims to violations of Ohio Adm.Code 4123:1-5-05(H) and 4123:1-5-11(D)(10)(a).

{¶ 34} 27. In a December 16, 2019, affidavit, Burger averred that claimant had never discussed with him any issues regarding the machine, and, specifically, she never talked to him about the modified guard being too heavy.

{¶ 35} 28. On March 14, 2020, a staff hearing officer ("SHO") issued an order, in which the SHO denied claimant's IC-8 application, finding the following: (1) Ohio Adm.Code 4123:1-5-05(H) does not apply to the case because that section confines protection to a single function machine, and the machine in the present matter was a multifunction machine, in that the rolls compressed the plastic onto the die and moved the die from one conveyor belt to the other; (2) Ohio Adm.Code 4123:1-5-11(D)(10)(a) was not violated for the following reasons: a safety device need not be foolproof; the purpose of a

specific safety requirement is to provide reasonable but not absolute safety for employees; the increased weight of the replacement guard made it less effective and efficient but not useless; and regardless of whether employees had ever complained to the employer that the guard was too heavy, there is no evidence that the employer had been forewarned of the malfunction by a prior malfunction of the guard.

{¶ 36} 29. On April 8, 2020, claimant filed a request for rehearing with the commission, which denied the request on July 21, 2020.

{¶ 37} 30. On October 27, 2020, claimant filed a writ of mandamus in this court.

Conclusions of Law and Discussion:

{¶ 38} For the reasons that follow, it is this magistrate's decision that this court should deny a writ of mandamus.

{¶ 39} In order for this court to issue a writ of mandamus, a relator must establish the following three requirements: (1) that relator has a clear legal right to the relief sought; (2) that respondent has a clear legal duty to provide such relief; and (3) that relator has no adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 40} To establish a VSSR, a claimant must prove that: (1) there exists an applicable and specific safety requirement in effect at the time of the injury; (2) the employer failed to comply with the requirements; and (3) the failure to comply was the proximate cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972).

{¶ 41} The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193 (1983). However, because a VSSR is a penalty, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989). The question of whether an injury was caused by an employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion test. *Trydle*; *State ex rel. A-F Industries, ACME-FAB Div. v. Indus, Comm.*, 26 Ohio St.3d 136 (1986). Furthermore, a safety requirement must be specific enough to plainly apprise an employer of its legal obligations to its employees. *State ex rel. Frank Brown & Sons, Inc. v. Indus, Comm.*, 37 Ohio St.3d 162 (1988).

{¶ 42} Claimant's sole argument is that the employer violated the specific safety requirement in Ohio Adm.Code 4123:1-5-11(D), which requires the guarding of nip points and provides as follows:

> (10) Nip points.
>
> (a) Means shall be provided to protect employees exposed to contact with nip points created by power driven in-running rolls, rollover platen, or other flat surface material being wound over roll surface.
>
> Ohio Adm.Code 4123:1-5-01(B)(94) provides the definition of "nip point":
>
> "Pinch, nip, or shear point": the point or points at which it is possible to be caught between the moving parts of a machine, or between the material and the moving part or parts of a machine.

{¶ 43} However, safety regulations do not impose strict liability on employers whenever a safety device fails. "[T]he purpose of specific safety requirements [is to provide] *reasonable*, not absolute, safety for employees. Decisions of this court have acknowledged the practical impossibility of guaranteeing that a device will protect against all contingencies or will never fail." (Emphasis sic.) *State ex rel. Jeep Corp. v. Indus. Comm.*, 42 Ohio St.3d 83, 84 (1989).  Thus, the employer need not provide a fool-proof guard but must provide only a guard that is sufficient to protect the employee. *State ex rel. Cincinnati Drum Serv., Inc. v. Indus. Comm.*, 10th Dist. No. 87AP-534 (Feb. 9, 1989).

{¶ 44} Furthermore, the Supreme Court of Ohio has recognized the "one-time malfunction" exception or defense. A safety rule "does not purport to impose absolute liability for an additional award whenever a safety device fails. The regulation does not forewarn the employer that, in addition to providing a safety device, the safety device must also be completely failsafe." *State ex rel. M.T.D. Prods., Inc. v. Stebbins*, 43 Ohio St.2d 114, 118 (1975). Thus, "[t]he fact that a safety device that otherwise complies with the safety regulations failed on a single occasion is not alone sufficient to find that the safety regulation was violated." *Id*. Under this exception, the question before the commission is "whether [the employer] had ever been forewarned of the malfunction on the date of injury by a prior malfunction of the safety device." *State ex rel. Precision Thermo-Components, Inc. v. Indus. Comm.*, 10th Dist. No. 09AP-965, 2011-Ohio-1333, ¶ 29. Therefore, the issue

under this exception is whether there was evidence of a prior history of malfunctions or such that the employer should have been aware that a malfunction would occur.

{¶ 45} In the present case, claimant argues that Ohio Adm.Code 4123:1-5-11(D)(10)(a) was violated when the modified guard on the machine was modified and rendered ineffective. Claimant asserts that a guard designed to trigger shutdown of a machine does not protect workers from contact with nip points if it has been modified so that it will not trigger shutdown on contact as a body part is dragged into the working machine. Claimant claims there was no evidence submitted establishing that the modified guard did anything to prevent contact with the machine's point of operation, and, at best, could only establish that some maintenance employees and a few of the machine operators were able to lift the heavier guard to trigger the interlock switch. Claimant reasons that the guard was designed to lift when an employee hits it, not just when somebody intentionally lifts it, and the witnesses who operated the machine on a regular basis all testified that the modified guard no longer stopped the machine when it contacted a hand. Thus, because the guard was too heavy to trigger even when contacted by a hand or materials, according to employees, the SHO could not find credible Wallace's opinion that the modified guard continued to function as designed by the OEM. Also, claimant contests the SHO's finding that there was no evidence that the modified guard had ever previously malfunctioned, and, thus, the employer could not be liable for the first-time failure of a safety device. Claimant points out that although this was the first injury on the machine, the witnesses stated that the modified guard consistently malfunctioned because it rarely stopped production, unlike the original guard. Furthermore, claimant points out, even if there were never any complaints about the modified guard being too heavy or ineffective, the employer never tested the new guard to see if it functioned properly.

{¶ 46} The commission counters that the fabricated guards provided reasonable safety to the operators exposed to the nip points when considering that it ran three of the machines over double and triple shifts without other incidents or injuries during the ten-month period between fabrication of the modified guards and claimant's injury. The commission also points out that even if the modified guards were less sensitive because they no longer sagged in the middle with the modification, such does not mean that the modified guards were not a reasonable means to protect the nip points. The commission

also counters that it properly determined a one-time malfunction was not foreseeable because the employer was not forewarned of any issue with the modified guards. The employer similarly asserts there was no evidence that it had knowledge that the modified guard was not working properly, and the only testimony that an employee reported a malfunction to the company came from Betts, who claimed she told her supervisor Philpott and maintenance employee Tatulinski, both of whom denied such a conversation with Betts. The employer also notes that claimant has waived the argument that the guard had previously malfunctioned when it was struck by an operator's hand, because claimant specifically stated at the hearing that she was not making this argument, instead only raising the argument as it related to prior instances when materials struck the guard.

{¶ 47}  After a review of the commission's decision and the evidence presented in this case, the magistrate concludes that there was some evidence to support the commission's decision that there was no VSSR found in Ohio Adm.Code 4123:1-5-11(D)(10)(a). The SHO found Adm.Code 4123:1-5-11(D)(10)(a) was not violated because a safety device need not be foolproof; the purpose of a specific safety requirement is to provide reasonable but not absolute safety for employees; the increased weight of the replacement guard made it less effective and efficient but not useless; and regardless of whether employees had ever complained to the employer that the guard was too heavy, there is no evidence that the employer had been forewarned of the malfunction by a prior malfunction of the guard. There was some evidence to support these findings.

{¶ 48}  It is not disputed that the modified guard did not prevent the injury in this case, and there was no alternative explanation offered in the record as to how this injury could have occurred without a failure of the modified guard. Furthermore, it is undisputed that the modified guard was heavier than the original guard, although there was conflicting testimony about whether the modified guard was any more difficult to lift than the original guard. Regardless, irrespective of whether the modified guard failed in this instance or the modified guard was heavier than the original guard, there was clearly some evidence in the record to support the SHO's findings that the modified guard still provided reasonable safety, the modified guard was not useless, and the employer had not been forewarned of the malfunction by a prior malfunction.

{¶ 49} In support of the finding that the modified guard still provided reasonable safety and was not useless, Soucy testified that material hitting the guard both before and after the guard was modified shut off the machine at the same rate, he did not think the modified guard was less safe than the original guard, and the modified guard was safe and effective. Philpott testified he was not concerned that the design of the modified guard was unsafe; the team designing the modified guard knew it was heavier than the original guard, but the team tested it, and it still worked as expected; he believed claimant's injury would have occurred with the original guard too; and he did not believe that the addition of the one-inch bar to the modified guard caused or contributed to the injury. Shah testified the modified guard still flipped up when thicker material hit it, albeit less frequently than with the original guard, and she could still lift the modified guard with two hands. Boron testified he did not think the modified guards were more difficult to lift; the modified guard did not make the machine less safe; to shut off the machine, the modified guard had to be lifted less than one half of one inch; and he was able to lift the modified guard with one hand. Patel testified that the modified guard did not make the machine less safe; after the TPM, if an operator were to accidentally hit the modified guard, it was the same amount of force to activate it as the original guard; and material would hit both the original and modified guards and stop the machine. Boughton also admitted that the modified guard still stopped when struck by a die, but just not as often as the original guard. In the Wallace report submitted by the employer, Wallace indicated that the modified guard operated as expected by the OEM, and the reinforcing bar in no way altered the function of the modified guard. Therefore, there was some evidence to support the SHO's finding that the modified guard provided reasonable safety for employees, and the increased weight of the modified guard did not render it useless.

{¶ 50} In support of the finding that the employer had not been forewarned of the malfunction by a prior malfunction, Soucy, Tatulinski, Sestan, Trunkely, and Boron testified that the guard was inspected weekly by lifting it up to make sure the machine stopped. Furthermore, Soucy, Tatulinski, Fielder, Sestan, Philpott, Bonner, and Trunkely testified that they knew of no complaints regarding the modified guards, and nobody told them that the modified guard was too heavy or operators were having difficulty lifting it. Burger averred that claimant had never talked to him about the modified guard being too

heavy. Shah and Thurman also testified that they never complained to anybody about the modified guards being too heavy or unsafe, and Thurman stated she never told the employer that the modified guard was not being triggered. Although Betts testified she told Philpott that the modified guard was too heavy, Philpott denied such, and Betts admitted that she did not mention any safety issues to any supervisors regarding the modified guard. Boughton likewise admitted that she never told the employer the modified guard was unsafe. Further supporting a lack of forewarning by the employer, Fielder, Sestan, and Thurman testified they were not aware of any other accidents on any of the machines before or after the incident in question, and no other witness testified that they knew of any other accidents or injuries on the machines. The employer's records also contained no reports of incidents or injuries due to malfunctioning guards on the machines.

{¶ 51} Claimant argues that although there was testimony disclaiming there had ever been complaints about the guard being too heavy, this evidence must be considered in light of the evidence that the modified guard was never tested for effectiveness when contacted. Initially, the magistrate notes that claimant presents no authority that requires the specific type of testing she urges, i.e., that the standard to meet Ohio Adm.Code 4123:1-5-11(D)(10)(a) requires a test demonstrating that any contact from a human hand or materials activates the guard. Ohio Adm.Code 4123:1-5-11(D)(10)(a) does not require a flip-guard activate on contact, by a hand or otherwise. Instead, the code provision requires only that "means" be provided to protect employees from nip points.

{¶ 52} Notwithstanding, what is clear from the evidence in this case was that the guard was continually tested on a weekly basis, and it met the standard of shutting off the rollers when lifted. Furthermore, as mentioned above, Soucy testified that material hitting the guard both before and after the guard was modified, shut off the machine at the same rate; Shah testified the modified guard still flipped up when thicker material hit it; Patel testified that if an operator were to accidentally hit the modified guard, it was the same amount of force to activate it as the original guard; and Boughton testified that the modified guard still stopped when struck by a die, but just not as often as the original guard. Thus, even though there was no explicit testimony that the guard was specifically tested by the employer using intentional contact by a human hand, there was some testimony from

actual experience in the field that the modified guard still flipped up when struck, and it was no more difficult to flip up than the original guard.

{¶ 53} With regard to the SHO's finding that there was no evidence that the modified guard had ever previously malfunctioned, and an employer cannot be held liable for the first-time failure of a safety device, claimant counters that this might have been the first injury on the machine, but it was not the first malfunction of the modified guard, pointing to the testimony that the modified guard "rarely" shut off the machine. However, the testimony previously outlined supports a finding that the machine was still shutting off when something bumped and/or flipped up the modified guard, although there was conflicting testimony whether the shutoffs were occurring at a less frequent rate than with the original guard. Regardless of whether the modified guard was activating with a "bump" or some harder contact, or rarely or frequently, there was no evidence that the modified guard had ever failed to protect an employee from the exposed nip points, which is the specific safety requirement at issue here. In her brief, claimant summarizes the issue as a "simple" one: "[A] guard designed to trigger shutdown of a machine does not protect workers from 'contact with nip points created by power driven in-running rolls' as required by Ohio Adm.Code 4123:1-5-11(D)(10)(a) if it has been modified so that it will not trigger shutdown on contact as a body part is dragged into the working machine." (Claimant's Brief at 22-23.) Here, there was no evidence in the record that the modified guard had previously failed to protect an employee from nip points after a body part was dragged into the machine, as claimant phrases it. Thus, consistent with the SHO's determination, there was no evidence that the modified guard had previously malfunctioned in a manner that was a violation of the specific safety requirement at issue here.

{¶ 54} Accordingly, it is the magistrate's decision that this court should deny the claimant's petition for writ of mandamus.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).